Hector Leandro VAZQUEZ, Appellant,

v.

ATTORNEY GENERAL OF the UNITED STATES et al.

No. 23459.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1970.

Decided July 16, 1970.

Mr. David Carliner, Washington, D. C., for appellant.

Mr. Edwin K. Hall, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Gil Zimmerman, Asst. U. S. Attys., were on the brief, for appellees.

Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal from the District Court presents a hitherto unresolved question of the amenability of one possessing dual citizenship to the obligations of military service imposed by the Military Selective Service Act of 1967. Its resolution involves consideration of the relationship between the provisions of the Treaty of Friendship, Commerce, and Navigation entered into in 1853 between the United States and the Argentine Republic, 10 Stat. 1005, on the one hand, and, on the other, a statutory prescription of the Immigration and Nationality Act that a minor child born abroad of alien parents automatically assumes United States citizenship upon the naturalization of his parents in this country. On the facts shown in the record before us, and for the reasons hereinafter appearing, we hold that the United States, by reference to the reciprocal obligations assumed by it in the Treaty, was disabled from subjecting appellant to involuntary military service.

I

Appellant was born in Argentina in 1949 of Argentinian citizens. He and his parents were admitted to the United States for permanent residence in 1955. The locale of that residence is Los Angeles County, California. In 1962, when appellant was twelve years old, his par-

ents became naturalized citizens of the United States. Section 321(a) of the Immigration and Nationality Act, 8 U.S.C. § 1432(a), provides that a child situated as was appellant becomes a United States citizen upon the naturalization of his parents if such naturalization takes place while the child is under the age of sixteen. Article X of the 1853 Treaty between the United States and the Argentine Republic, which continues in being, contains the mutual undertaking that "[T]he citizens of the United States, and the citizens of Argentine Confederation residing in the United States, shall be exempted from all compulsory military service whatsoever. * * * " Section 4(a) of the Military Selective Service Act of 1967, 50 U.S.C. App. 454(a), provides that "every male citizen of the United States and every male alien admitted for permanent residence" shall be subject to military service under the Act except as any such alien shall apply to be relieved from such service, in which latter event the applying alien "shall thereafter be debarred from becoming a citizen of the United States." [1]

In 1965, when appellant was fifteen, an "Application for a Certificate of Citizenship" was filed on his behalf by his mother.[2] The application purported to bear appellant's signature in the space provided for signing by "applicant, or parent, or guardian," although the record presents a serious question as to whether the signature is in fact that of appellant.[3] Appellant was in due course notified by the Immigration and Naturalization Service to present himself, with his parents, for an interview in respect of the application. The notice recited that failure to appear would result in the application's being closed thirty days thereafter, subject to reopening upon request. Appellant did not appear, nor did he ever thereafter seek reopening; and no certificate of United States citizenship has, accordingly, ever been issued to him. In January of each of the years 1966 through 1969, appellant affirmatively registered as an alien resident in the United States, as statutorily required of such persons by 8 U.S.C. § 1305.

When appellant became eighteen, he registered with his Local Selective Service Board as a "male person now in the United States," pursuant to the requirement to that effect contained in Section 3 of the Military Selective Service Act of 1967, 50 U.S.C. App. § 453. Thereafter, in May of 1968, and as required by Argentina's laws of its citizens, he registered with the Argentine Consulate for military service with the armed forces of Argentina as a member of the Class of 1949.

In April, 1969, appellant was notified by his Local Selective Service Board to report for processing for induction into the armed forces of the United States. He forwarded this notice, together with his application to be relieved from United States military service, to the Argentine Embassy in Washington. The Em-

---

1. *See* 42 Op.Att'y Gen. 28 (April 1, 1968). The Attorney General there ruled that citizens of countries having reciprocal military exemption treaties with the United States are exempt, upon application for such exemption after registering with Selective Service, from compelled military service by the latter even though they be permanent United States residents. *See* Itzcovitz v. Selective Service System Local Board Number 6, 301 F.Supp. 168 (S.D. N.Y.1969). As will appear, it is the contention of appellees that this ruling is not determinative here because appellant, although an Argentinian citizen under the laws of that country, has also become an American citizen under the laws of the United States.

2. Provision for the issuance of such certificate is made in § 341 of the Immigration and Nationality Act, 8 U.S.C. § 1452. The certificate itself does not create citizenship, but only constitutes formal evidence of a status of citizenship theretofore acquired.

3. Appellees concede that the entries in the form are in the hand of appellant's mother. They say that the signature itself is in a different hand, and therefore is presumably that of appellant. Appellant asserts the contrary. The matter was not explored or resolved in the trial court.

bassy thereupon requested the United States Department of State to inform the proper authorities that appellant was exempt from United States military service under the Treaty. The State Department transmitted this request to the National Headquarters of the Selective Service System for "appropriate action." Appellant was thereafter informed by his Local Board that his induction notice had been cancelled.

Not long thereafter, the Los Angeles District Director of the Immigration and Naturalization Service informed Selective Service Headquarters that appellant had become a United States citizen in 1962 by reason of the naturalization of his parents in that year. The Selective Service System Director then wrote a letter to the State Director of Selective Service in California, returning appellant's application for exemption, and directing that it be cancelled, with appellant to be inducted as one who had become a United States citizen in 1962, and who was not, therefore, eligible for exemption under the Treaty. When a new induction notice was forthcoming, appellant sought declaratory and injunctive relief in the District Court against the Attorney General of the United States, as the official responsible for the Immigration and Naturalization Service, and the Director of the Selective Service System. He challenged the validity of the ruling that he had become a United States citizen by reason of the naturalization of his parents; he asked for a declaration of his status as an Argentine citizen resident in the United States and, as such, entitled to the exemption provided by the Treaty upon his application therefor.

The matter came on for hearing in the District Court upon appellant's mo-

tion for a preliminary injunction against his induction, and upon appellees' various alternative motions (1) to transfer the case to the Southern District of California, (2) to dismiss for lack of subject-matter jurisdiction, and (3) for summary judgment on the merits. The District Court, in an oral opinion which is not part of the record before us, denied the request for transfer, and it rejected the suggestion of want of jurisdiction by reference, so says the brief of appellees, to Oestereich v. Selective Service System Local Bd. No. 11, 393 U. S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). However, it granted summary judgment to appellees, although it stayed its judgment long enough to enable appellant to appeal and to seek a stay of induction from this court pending final determination of the appeal. A division of this court granted such a stay.[4]

Because of questions raised by this court during oral argument of the appeal about the relationship of the Treaty to the operation of the Selective Service Act, both parties were permitted to submit supplemental memoranda. Appellees' submission consisted of a letter to the U. S. Attorney from an Assistant Legal Adviser of the State Department. That letter stated the position of the Department to be that the reciprocal military service exemption provision of the Treaty may be invoked only by Argentine citizens; and that, for this purpose, the Department does not consider "a dual U. S./Argentine national residing in the United States" to be an Argentine citizen within the meaning of the exemption. It noted that the subject of dual citizenship is a complex one, and that, because of these complexities, the rights of such persons have been spelled out in a number of instances through explicit treaty provisions.[5] There is,

---

4. In its brief the Government states that it does not abandon its claim of lack of subject-matter jurisdiction, but it does not deal with that issue because of the action of this court earlier, in the face of the Government's opposition which asserted a lack of jurisdiction, in granting a stay of induction pending appeal.

5. The United States, but not Argentina, is a party to the Protocol Relating to Military Obligations in Certain Cases of Double Nationality, which was a product of The Hague Conference of 1930. The first two provisions of that Protocol are of interest as indicating how the military service problems of a dual national

however, no such clarifying agreement currently in being between the United States and Argentina. The letter added that the Department is not informed as to the policy of Argentina in applying the 1853 Treaty.

Three items of information were supplied by appellant's supplemental memorandum. One was a translation by the Argentine Embassy of Argentine Law No. 346, effective in 1869, relating to Argentinian citizenship. This provides generally that alien residents for two consecutive years over eighteen years of age acquire Argentine citizenship only by professing to a Federal Judge in Argentina "their desire to become a citizen." Of particular interest with respect to an American counterpart of appellant residing in Argentina, the Law provides that the foreign-born minor son of a father who becomes a naturalized Argentine citizen, may himself become such a citizen only by representing to a Federal Judge that he has enlisted in the Argentine armed forces at the time required by law. The second item furnished post-argument was a translation

by the Argentine Embassy of a notice to appellant from the Argentine authorities to report in Buenos Aires for military induction on March 6, 1970.[6] Lastly, appellant supplied a copy of the brief filed in the United States Supreme Court by the Solicitor General for appellant Secretary of State in Rogers v. Bellei, 398 U.S. 935, 90 S.Ct. 1494, 25 L. Ed.2d 682, which is characterized as generally asserting the desirability of resolving issues arising out of dual citizenship by reference to affirmative acts of allegiance and attachment to one state or the other.[7]

## II

Appellant's brief in this court is largely devoted to the broad proposition that the Congress is powerless to impose automatic U. S. citizenship upon a resident alien minor without his consent and solely by virtue of the naturalization of his parents. The barrier to this is said to reside alternatively in international law concepts of comity among sovereign nations, and the Due Process Clause of the Fifth Amendment. Thorough-going

---

like appellant have been expressly handled by international agreement:

ARTICLE 1. A person possessing two or more nationalities who habitually resides in one of the countries whose nationality he possesses, and who is in fact most closely connected with that country, shall be exempt from all military obligations in the other country or countries.

This exemption may involve the loss of the nationality of the other country or countries.

ARTICLE 2. Without prejudice to the provisions of Article 1 of the present Protocol, if a person possesses the nationality of two or more States and, under the law of any one of such States, has the right, on attaining his majority, to renounce or decline the nationality of that State, he shall be exempt from military service in such State during his minority.

See generally 2 Hyde, International Law Chiefly As Interpreted And Applied By the United States § 381 (1945), and Orfield, The Legal Effects of Dual Nationality, 17 Geo.Wash.L.Rev. 427, 430 (1949).

6. We are informed by appellant's counsel that appellant did not so report because he has been given a dependency deferment by the Argentine authorities.

7. This case, which is to be reargued at the 1970 Term, involves the claim of a dual national that his American citizenship, acquired by reason of his birth abroad to an American mother, cannot constitutionally be terminated by reason of his failure to meet the requirements for residence in the United States contained in § 301(b) of the Immigration and Nationality Act, 8 U.S.C. § 1401(b), that is to say, five years of continuous residence in the United States between the ages of fourteen and twenty-eight. A three-judge District Court upheld the contention, Bellei v. Rusk, 296 F.Supp. 1247 (D.D.C. 1969). In the Supreme Court the Government argued vigorously that, in the case of non-14th Amendment citizenship, the Congress may impose, as a condition subsequent to its investment of one born abroad with United States citizenship, the necessity of affirmative acts demonstrating allegiance to such citizenship.

acceptance of this approach would entail the invalidation of Section 321(a) of the Immigration and Nationality Act, certainly as applied to appellant and for an indeterminate range of purposes over and above that of the only one with which we are immediately concerned, i. e., vulnerability to compulsory military service.

We see no need on this record to sweep so broadly. The decisive question in our view does not turn upon the validity vel non of this statute, or the necessity of a narrowing construction of it in order to put to one side its asserted infirmities. It is, rather, a matter of the rights available to appellant, as a conceded Argentine citizen, under the Treaty with respect to compelled military service in the United States. Appellees appear to us to rest in the last analysis upon the State Department's position that, although appellant may be taken to be simultaneously an American and an Argentinian citizen, the latter half of the equation does not, under a proper construction of the Treaty, count for anything in terms of invoking the Treaty's reciprocal immunities from unconsented military service. It is the former, we are told, which was intended by the Treaty signatories to be conclusive.

We are not persuaded that this is so, at least in respect of one like appellant who has such an exiguous record of affirmative preference for his United States citizenship over his Argentine. First, it seems clear that one party to the Treaty—Argentina—does not agree that the Argentinian component of appellant's dual citizenship is beyond the scope of the Treaty exemption from involuntary military service. The record reflects that the Argentine Embassy explicitly represented to the State Department its view that appellant fell within the Treaty's protection. The opinion of one party to a compact is not, of course, conclusive of its proper construction, but it is evidence of the intent of the parties which, in this instance, is given added weight by the further showing that Argentina has, continuously since 1869, implemented that understanding by a law which protects an American-born minor resident in Argentina from being subjected involuntarily to Argentinian citizenship solely because his father becomes an Argentinian citizen by naturalization. Such a minor, although resident in Argentina, acquires Argentinian citizenship only by seeking it from a Federal Judge upon an affirmative showing that he has voluntarily enlisted in the armed forces of the Argentine.

Appellees argue, however, that appellant has also affirmatively demonstrated his attachment to his American citizenship by his own actions independently of his parents' naturalization. They say in their brief that, although they "do not question appellant's claim that he is a citizen of Argentina under the laws of that country," this is not incompatible with his acquisition of United States citizenship while a minor. They assert that he has not acted, and very likely cannot act until he is twenty-one, to relinquish that citizenship by his own choice.[8] Contrarily, they point to circumstances which, they insist, show appellant's own purpose to accept and to confirm the citizenship originally imposed upon him by Section 321(a). These are that appellant has continued to reside in the United States since his automatic acquisition of citizenship at the age of twelve, and at the age of fifteen filed an application for a certificate of citizenship.

We find these facts to be more ambivalent in their revelation of appellant's purposes than do appellees. It is surely not surprising that a twelve-year old boy would rather continue to reside with his parents than go back to Argentina as an

8. Under this approach appellant would appear to be caught between a draft law which regards young men as capable of fighting for their country at eighteen, and a citizenship law which makes them incapable of saying for which of the two countries commanding their allegiance they wish to fight.

earnest of his personal rejection of the status imposed upon him by Section 321(a). Further, the record is far from establishing that appellant, at the age of fifteen, actively sought the issuance of a certificate of citizenship. It is by no means certain that he signed the application concededly prepared by someone else. What is certain is that he did not pursue the application by responding to the notice to present himself for an interview, even though he was warned in the notice that his failure to do so would cause the application to lapse.

There is also the evidence that, within a few months after that lapse, he took the affirmative step of registering with the Argentine Consulate as a resident alien—a step he repeated annually during the succeeding three years. When he became eighteen, he registered with Selective Service as he was required by the law to do, along with all other male residents of the United States. But, at approximately the same time, he registered at the Consulate as an Argentinian citizen for military service under the laws of Argentina. When he received his first notice of induction into the United States military forces, he applied for an exemption under the terms of the Treaty, although that act appeared to expose him to the forfeiture for all time of the prospect of American citizenship.

Appellees insist that it is contrary to equity and good conscience for one to reside in this country with all the benefits inherent in such residence and, at the same time, to avoid the burdens of universal military service. As a general proposition, this may well be true. It is, at any rate, a cardinal principle embodied in the Military Selective Service Act of 1967 in its application to' resident aliens generally. It is not, however, a principle which entered into the negotiation and ratification of the 1853 Treaty with Argentina or with a small number of other countries with whom similar treaties are still subsisting.[9] It may well be that the Government today would not commit itself to such an undertaking, but dissatisfaction with a solemn engagement has not as yet been thought, by this country at any rate, to be an adequate basis for ignoring the commitment. We need not dwell upon the legal problems, as obvious as they are serious, involved in any reading of Section 321(a) as an intentional effort by the Congress to evade the 1853 Treaty.

Our holding on this record is a narrow one, and we leave for another day collateral issues which conceivably, although not certainly, could arise by reason of the complexities of appellant's citizenship status.[10] We do not hold that Section 321(a) is inoperative to confer

9. The Attorney General's Opinion, Note 1 *supra*, relates that the 1853 Treaty with Argentina is one of a total of ten such treaties providing unqualified reciprocal exemptions from compelled military service. Most of such treaties predate World War II, and none has been entered into since 1950. The Attorney General stated his understanding to be that the "Department of State does not intend to include such provisions in future treaties."

It is of some interest to note that the Attorney General's advice was sought because of conflicting views on the part of the State Department and the Selective Service System as to the continued effectiveness of these treaty provisions in the light of a 1951 amendment of the draft law which declared ineligible for exemption "aliens admitted for permanent residence in the United States." The Attorney General agreed with the view of the former that the treaty exemptions

had, notwithstanding this statute, to be honored.

10. Blackstone was of the opinion that there was no gainsaying the principle that "every man owes natural allegiance where he is born, and cannot owe two allegiances, or serve two masters at the same time." *Commentaries on the Law* (Gavit ed.), Book 1, Ch. 10, p. 157. Thus it is that the concept of dual citizenship has been a fruitful source of difficulty for both the persons and the countries concerned. It has been characterized as "an undesirable phenomenon detrimental both to the friendly relations between nations and the well-being of the individuals. * * *" M. Bar-Yaacov, Dual Nationality 4 (1961). *See* Research in International Law, Harvard Law School, 23 American Journal Int.Law (Special Supplement) (1929).

**522**

United States citizenship upon appellant for any purpose whatsoever. We do hold that the United States citizenship with which it purported to clothe appellant is not predominant over his Argentinian citizenship for the purposes of Article X of the 1853 Treaty.[11] This means that his application for exemption under that Treaty from compulsory United States military service should have been honored.

We reverse the judgment appealed from, and remand the case to the District Court for further proceedings consistent herewith.

It is so ordered.

---

11. The case law relied upon by each party is not particularly illuminating, much less conclusive, of the problem presented by this case. It is, for one thing, somewhat unusual for a foreign-born resident to be resisting a status of citizenship thrust upon him by Congress. For another, the Supreme Court has dealt with issues arising out of dual citizenship on only three occasions; and those all involved persons born in the United States and possessed, accordingly, of a United States citizenship conferred upon them by the Constitution, not the Congress. Mandoli v. Acheson, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146 (1952); Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952); Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320 (1939). In those cases it was uniformly held that none of the dual citizens involved had either done anything which forfeited his United States citizenship, nor been required to elect between his two nationalities. They did not involve treaty provisions.